**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7          IN THE UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                    SAN JOSE DIVISION

10   Michael Wayne Hunter,                    NO. C 06-07707 JW

11              Petitioner,          **ORDER DENYING PETITION FOR WRIT**
                                     **OF HABEAS CORPUS; DENYING**
        v.                           **CERTIFICATE OF APPEALABILITY**
12
     James A. Yates, Warden, et al.,
13
                Respondents.
14   _____/

15                    **I.  INTRODUCTION**

16          This matter is now before the Court for consideration of Michael Wayne Hunter's

17   ("Petitioner") Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254[1] concerning his 2002

18   conviction in San Mateo County Superior Court.  For the reasons set forth below, the Petition is

19   DENIED as to all claims.  In addition, no certificate of appealability will be issued for Petitioner's

20   claims.

21                    **II.  BACKGROUND**

22   **A.    Facts**

23          The California Court of Appeal summarized the facts of Petitioner's case as follows

24   (Petitioner is referred to as "Appellant" or "Hunter"):[2]

25   _____

26          [1]  (Petition for a Writ of Habeas Corpus, hereafter, "Petition," Docket Item No. 1.)

27          [2]  (Declaration of Daniel B. Harris in Support of Michael Hunter's Petition for a Writ of
     Habeas Corpus, hereafter, "Harris Decl.," Ex. Z, Opinion of the California Court of Appeal,
28   hereafter, "Appeal," Docket Item No. 4.)

**United States District Court**
For the Northern District of California

Jay and Ruth Hunter, [A]ppellant's father and stepmother, were found dead in their home in Pacifica on December 29, 1981.  Both had multiple shotgun wounds.

Hunter testified that he killed his stepmother and father.  His defense was diminished capacity.[3]  Hunter testified that he had a tumultuous relationship with his father.  During his childhood, his father physically and emotionally abused him.  A number of witnesses testified that Hunter's father was an alcoholic who showed him little affection and physically abused him throughout his childhood.  Since he was in elementary school, Hunter had "dark thoughts" about killing his father.

Hunter's parents divorced in the early 1970s when Hunter was 14 years old.  He remained with his mother, and testified that his father did not abuse him thereafter.  Hunter's father married his stepmother, Ruth Hunter, about two years after the divorce.  Ruth Hunter never physically abused him.  Hunter's mother died in May 1979.

After Hunter's father remarried, Hunter had a number of serious disagreements with both his father and stepmother.  One stemmed from an incident in September or October 1981 in which Hunter held a party at Jay and Ruth Hunter's house while they were on vacation.  Partygoers damaged the Hunters' carpet with burning candles and took items from the house.  Hunter became angry when he discovered on October 12, 1981, that Ruth Hunter, representing herself as his mother, came to his home when he was not there looking for the missing items.  Hunter telephoned his father and they argued.

Immediately following the argument, Hunter took his roommate's identification and used it to purchase a shotgun.  Within a day or two, he took the shotgun to his friend Tom Henkemeyer's home in Citrus Heights.  Hunter showed him the gun, and said he was going to use it to kill his father.  Hunter left the gun at Henkemeyer's house.

Over the next two months, Hunter regularly took Valium, smoked marijuana, and drank beer.  On December 28, 1981, Hunter attended a memorial service for an acquaintance's mother who died of cancer, as Hunter's mother had.  During the service, he reflected on his father's treatment of his mother.  Hunter became furious, thinking that "the good die and the bad just keep going on."  While at the service, he decided to kill his father.

Following the memorial service, Hunter purchased ammunition because he "was going to kill [his] father."  Hunter testified that Henkemeyer drove his own car with the shotgun in it to Hunter's home in Mountain View, and left it there.[4]  Hunter stole a Trans Am automobile from a dealer, because he wanted a fast car to go to his father's home in Pacifica and kill him.  The car stalled, and he abandoned it.  He went home, drank beer and took Valium, and fell asleep.  He awoke after dark, and decided to go to the beach north of Half Moon Bay, because his mother's ashes were scattered in the ocean.

Hunter loaded Henkemeyer's car with his helmet, jacket, gloves, and the shotgun shells.  He testified that he brought the helmet with him to hide his identity and to protect himself from broken glass, because he planned to break a window to get into his father's house.  When he arrived at the beach, Hunter drank more beer, smoked marijuana and took

---

[3]  The parties agreed that the killings were committed before the defense of diminished capacity was eliminated.  See People v. Wells, 33 Cal. 2d 330, 346 (Cal. 1949); People v. Gorshen, 51 Cal. 2d 716, 726 (Cal. 1959).

[4]  Henkemeyer denied that he brought the shotgun to Hunter.

2

Valium.  He became enraged thinking about his father.  Hunter jumped in the car and drove to Pacifica.

Hunter parked at the bottom of the hill by his father's house.  He loaded his shotgun and put on the motorcycle helmet and gloves.  Hunter entered his father's home by breaking a window.  He saw his father's silhouette in the darkness, and fired the shotgun at him until it was empty.  Hunter reloaded the shotgun and shot Ruth Hunter.  He heard screaming, and then realized he was the one screaming.

Dr. Roderick Pettis, a psychiatrist, testified that based on Hunter's "history of events, I think there's a reasonable likelihood that he was unable to deliberate, to think about the pros and cons and maturely reflect on what he was doing[.]"  Dr. Pettis' opinion was not a medical certainty, but a "reasonable medical possibility."

Dr. Paul Berg, a psychologist, was retained by defense counsel during Hunter's first trial, though he did not testify then.  In 1982, he interviewed Hunter and administered psychological tests.  The tests indicated an elevated level on the psychopathic deviate and hypomanic scales.  Hunter told Dr. Berg he drove from his home to Citrus Heights to receive the shotgun in order to kill both his father and stepmother, and that he did not feel remorseful about killing them.  Hunter also told him that he shot his stepmother because "she was a witness to what he did."  Dr. Berg opined that it was "overwhelmingly clear there was no lack of planning or intention connected with this act."

Dr. Craig Rath, a psychologist retained by the prosecution in Hunter's second trial, also interviewed Hunter and administered psychological tests.  Hunter's test results indicated an elevated level on the psychopathic deviate scale, as well as on the depression scale, though his hypomanic scale was lower than in 1982.  Dr. Rath also reviewed the report generated by Dr. Berg and reviewed the testimony of doctors who had testified in 1984.  He recalled that Hunter had told one of these doctors that he had no remorse.  Hunter told Dr. Rath that he was unremorseful initially, but felt remorse later.  He also told Dr. Rath that "he drove a considerable distance to Citrus Heights in order to acquire the shotgun."

Dr. Rath concluded that Hunter had antisocial personality disorder without a major mental illness.  He testified that antisocial personality disorder is "not a major mental illness in the sense of schizophrenia or being psychotic, being out of control with reality. . . . [T]he behavior is under volitional control[—one] can choose to do it or not do it."  He did not believe that Hunter's Valium and alcohol use affected his ability to premeditate and deliberate.  Dr. Rath based this opinion on Hunter's actions before and after the killings, and his tolerance to Valium and alcohol as a substance abuser.  Hunter acknowledged that he was "not a novice when it came to drugs."  Dr. Rath also opined that Hunter maturely and meaningfully reflected on his behavior on the day of the killings, and that the killings were not the result of an irresistible impulse.  Even if he assumed that all of the alleged abuse of Hunter by his father occurred, it would not change his opinion.  Dr. Rath had a high level of confidence in his opinion, based on Hunter's "planning, premeditation, [and] decisions made leading up to the offense and after the offense."

(Appeal at 3-6.)

On March 4, 1982, the District Attorney filed charges in San Mateo County Superior Court accusing Petitioner of two counts of murder in violation of California Penal Code section 187, with special allegations that he used a firearm within the meaning of California Penal Code sections

3

12022.5 and 1203.06(a)(1), and with special circumstances of multiple murders within the meaning of California Penal Code section 190.2(a)(3).[5]  (Answer to Order to Show Cause at 2, hereafter, "Answer," Docket Item No. 23.)  On February 9, 1984, Petitioner was convicted of the first degree murders of Jay and Ruth Hunter in <u>Hunter I</u>.[6]  The jury found true the special allegations and circumstances, thereby rendering Petitioner eligible for the death penalty.[7]  On February 25, 1984, the jury returned a verdict sentencing Petitioner to death.  (<u>Id.</u>)  On March 23, 1984, the trial court denied Petitioner's statutory motion to modify the verdict and sentenced him to death.  (<u>Id.</u>)

**B.**    <u>**Case History**</u>

On December 7, 1989, the California Supreme Court affirmed the judgment in <u>Hunter I</u>. (Petitioner's Memorandum at 4.)  On October 1, 1990, the United States Supreme Court denied Petitioner's writ of certiorari.  (<u>Id.</u>)

On August 11, 1993, the California Supreme Court denied Petitioner's state habeas petition. (September 2001 Order at 1-2.)  On March 24, 1994, Petitioner filed a Petition for Writ of Habeas Corpus in this Court, alleging, *inter alia*, ineffective assistance of counsel in <u>Hunter I</u>.  (<u>Id.</u> at 2; <u>see Michael Hunter v. Calderon (Hunter Habeas I)</u>, Case No. 90-03275-JW, Docket Item No. 1.)  The Court permitted limited discovery regarding Petitioner's habeas claims.  (September 2001 Order at 1-2.)  On April 16, 1996, the Court entered a Protective Order ("April 1996 Protective Order") limiting the use of materials discovered in <u>Hunter Habeas I</u> ("Protected Files"), which included confidential attorney-client and doctor-patient communications.[8]

---

[5]  (San Mateo County Superior Court Case No. C 1107 ("<u>Hunter I</u>").)

[6]  (Memorandum of Points and Authorities in Support of Michael Hunter's Petition for a Writ of Habeas Corpus at 4, hereafter, "Petitioner's Memorandum," Docket Item No. 2.)

[7]  (Harris Decl., Ex. V, Order Granting Respondent's Motion for Reconsideration, hereafter, "September 2001 Order," Docket Item No. 4.)

[8]  The April 1996 Protective Order states in its entirety:

All documents and information produced by Petitioner to Respondent as a result of Respondent's discovery requests (1) shall be deemed confidential; (2) may be used only for purposes of these habeas proceedings; and (3) may not be disclosed in whole or in part or in

4

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

On December 8, 1998, the Court granted summary adjudication in favor of Petitioner based on the finding that the prosecutor in <u>Hunter I</u> failed to turn over material impeachment documents relating to the credibility of a chief prosecution witness.  (September 2001 Order at 1-2.)  On February 3, 1999, pursuant to Petitioner and Respondents' stipulation, the Court entered a Final Judgment in <u>Hunter Habeas I</u> and reversed both the guilty and penalty judgments against Petitioner. (<u>Id.</u>)

On July 16, 2001, the Attorney General moved for reconsideration of the April 1996 Protective Order, relying on <u>Anderson v. Calderon</u>.[9]  (<u>See</u> <u>Hunter Habeas I</u>, Docket Item No. 361.) On September 13, 2001, the Court granted Respondents' Motion for Reconsideration and vacated the protective order.  (<u>Hunter Habeas I</u>, Docket Item No. 365.)  On September 17, 2001, Petitioner filed an emergency Motion for Reconsideration.  (hereafter, "Motion for Reconsideration," <u>Hunter Habeas I</u>, Docket Item No. 366.)  On September 24, 2001, the Court granted Petitioner's Motion for Reconsideration and reinstated a modified Protective Order, including the following language: "Nothing in this Order prevents the district attorney from using any material received as a result of the federal habeas litigation in connection with the retrial of Petitioner in the case of <u>People v. Hunter</u>, San Mateo County Superior Court No. C-11007.  Such material has been lodged with the San Mateo County Superior Court and shall be released pursuant to such state court's order." (<u>Hunter Habeas I</u>, Docket Item No. 368; <u>see</u> Petitioner's Memorandum at 11.)

The San Mateo District Attorney's office subsequently initiated retrial proceedings ("<u>Hunter II</u>").  (Petitioner's Memorandum at 20.)  The trial court then ordered that the Protected Files be released to the prosecution for use in Petitioner's retrial.  (<u>Id.</u>)  The trial court found that Petitioner

---

any form to any other persons or agencies without further order from this Court.  This Order shall remain in effect throughout these proceedings and after the conclusion of these proceedings and shall specifically apply in the event of a retrial of all or any portion of the criminal case against [P]etitioner.  If a retrial should occur, Respondent may petition the Court for reconsideration of the non-disclosure order in this action.  (September 2001 Motion at 2; <u>see</u> <u>Hunter Habeas I</u>, Docket Item No. 271.)

[9]  232 F.3d 1053 (9th Cir. 2000) (holding that attorney-client privilege is a matter of state law and not within the province of the federal court).

waived the attorney-client and work-product privileges by filing his claim for ineffective assistance

of counsel in <u>Hunter Habeas I</u>.  (Harris Decl., Ex. A, Reporter's Transcript in <u>Hunter II</u> at 213,

hereafter, "<u>Hunter II</u> Reporter's Transcript.")  On March 26, 2002, the jury returned its verdict,

finding Petitioner guilty of two counts of first-degree murder.  (Petitioner's Memorandum at 36.)

The jury found true the special allegations of use of a firearm and the special circumstances of

multiple murder.  (<u>Id.</u>)  On June 6, 2002, Petitioner was sentenced to a term of life in prison without

the possibility of parole.[10]  Petitioner filed a timely appeal to the California Court of Appeal,

contending that the trial court committed reversible error in releasing the Protected Files to the

prosecution in <u>Hunter II</u>.  (<u>Id.</u>)  On June 10, 2005, the California Court of Appeal, First Appellate

District, affirmed Petitioner's conviction.  (Answer at 2; <u>see</u> Appeal.)  July 12, 2005, Petitioner filed

a petition for review in the California Supreme Court.  (<u>Id.</u>)  On September 21, 2005, the California

Supreme Court denied the petition for review.

On December 15, 2006, Petitioner filed the present Petition.  On September 30, 2008, the

Court granted in part Respondents' Motion to Dismiss for Failure to Exhaust Administrative

Remedies.  (Docket Item No. 17.)  On June 24, 2009, the California Supreme Court denied

Petitioner's state habeas petition.  (Answer at 2.)  On July 16, 2009, Petitioner submitted a Notice of

Completion of Exhaustion of State Remedies.  (<u>See</u> Docket Item No. 18.)  On October 30, 2009, the

Court issued an Order reopening Petitioner's case and ordering Respondents to show cause why the

habeas petition should not be granted.  (Order Lifting Stay and Reopening Case, Requesting

Respondent to Answer, Docket Item No. 19.)

## III.  STANDARDS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district

court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to

the judgment of a state court only on the ground that he is in custody in violation of the Constitution

or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with

---

[10]  (<u>Id.</u>)  The trial court also ordered that Petitioner serve an additional two-year term for the use of a firearm and pay restitution fines pursuant to California Penal Code section 1202.4.  (<u>Id.</u>)

United States District Court

For the Northern District of California

respect to any claim adjudicated on the merits in state court proceedings unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

**A.   "Clearly Established Supreme Court Law"**

Clearly established federal law, as determined by the Supreme Court of the United States refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. See Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

**B.   "Contrary To"**

While the "contrary to" and "unreasonable application" clauses have independent meaning, they often overlap. See Williams, 529 U.S. at 385-89.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 413; see also Early v. Packer, 537 U.S. 3, 8 (2002). A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

**C.** **"Unreasonable Application"**

2

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

3

state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

4

unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at

5

412-13.

6

"[A] federal habeas court may not issue the writ simply because that court concludes in its

7

independent judgment that the relevant state-court decision applied clearly established federal law

8

erroneously or incorrectly." <u>Id.</u> Rather, that application must also be unreasonable. <u>Middleton v.</u>

9

<u>McNeil</u>, 541 U.S. 433, 436 (2004).

10

The objectively unreasonable standard is not a clear error standard. <u>Lockyer v. Andrade</u>, 538

11

U.S. 63, 75-76 (2003). After <u>Lockyer</u>, a federal court may not issue a writ of habeas simply

12

because, in the federal court's determination, "a state court's application of federal law was

13

erroneous, clearly or otherwise." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1068 (9th Cir. 2003). "While the

14

'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree

15

of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." <u>Id.</u> Thus,

16

deciding whether the state court decision was unreasonable may require analysis of the state court's

17

method as well as its result. <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003). Additionally,

18

habeas relief is warranted only if the constitutional error at issue is a structural error[11] or had a

19

———————————

20

    [11] A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." <u>Arizona v. Fulminante</u>, 499 U.S. 279, 310 (1991). The list of Supreme Court cases in which structural error analysis has been found to apply is short. <u>Campbell v. Rice</u>, 408 F.3d 1166, 1172 (9th Cir. 2005). They are: <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993) (failure to apply beyond a reasonable doubt standard); <u>Vasquez v. Hillery</u>, 474 U.S. 254, 264 (1986) (unlawful exclusion of member of defendant's race from grand jury); <u>Waller v. Georgia</u>, 467 U.S. 39, 49-50, 49 n.9 (1984) (denial of right to public trial); <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 177-78 n.8 (1984) (violation of right to self-representation at trial); <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344-45 (1963) (deprivation of right to counsel); and <u>Tumey v. Ohio</u>, 273 U.S. 510, 531-32 (1927) (trial by biased judge). <u>Id.</u> Examples of cases in which the Ninth Circuit found structural error are: <u>Cordova v. Baca</u>, 346 F.3d 924, 930 (9th Cir. 2003) (failure to give <u>Faretta</u> warning to defendant representing himself); <u>Powell v. Galaza</u>, 328 F.3d 558, 566-67 (9th Cir. 2003) (mandatory presumption effectively depriving defendant of right to jury); <u>Sheppard v. Rees</u>, 909 F.2d 1234, 1237-38 (9th Cir. 1989) (failure to inform defendant of nature of criminal accusation).

21

22

23

24

25

26

27

28

"substantial and injurious effect or influence in determining the jury's verdict." <u>Penry v. Johnson</u>, 532 U.S. 782, 795-96 (2001) (internal quotations omitted).

It is error for a federal court to review *de novo* a claim that was adjudicated on the merits in state court.  <u>See</u> <u>Price v. Vincent</u>, 538 U.S. 634, 638-43 (2003).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than deciding the claim on the basis of a procedural rule.  <u>Barker v. Fleming</u>, 423 F.3d 1085, 1092 (9th Cir. 2005).  The last reasoned decision constitutes an "adjudication on the merits" for purposes of § 2254(d) if the court finally resolved the rights of the parties on the substance of the claim, rather than on the basis of a procedural or other rule precluding state review of the merits.  <u>Id.</u>  The "adjudication on the merits" requirement does not mandate a hearing or other judicial process beyond rendering a decision.  <u>Id.</u>  In addition, the AEDPA generally requires federal courts to review one state court decision, rather than multiple state court decisions together.  <u>Id.</u> at 1093.

Where, as in this writ, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review.  <u>See</u> <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (internal citation omitted).  The California Court of Appeal rendered the last reasoned state court decision in Petitioner's case.

## IV.  DISCUSSION

Petitioner makes five claims regarding the trial court's order allowing the prosecution access to and use of the Protected Files.  First, Petitioner contends he was denied his federal constitutional rights against self-incrimination under the Fifth Amendment to the United States Constitution, to effective assistance of counsel under the Sixth Amendment, and to a fair trial and due process of law under the Eighth and Fourteenth Amendments.  Second, Petitioner contends his

United States District Court

For the Northern District of California

1   constitutional rights were additionally violated when the state engaged in prejudicial misconduct.

2   Third, Petitioner contends that his counsel in <u>Hunter I</u> denied him effective assistance of counsel,

3   which prejudiced Petitioner in <u>Hunter II</u>.  Fourth, Petitioner contends he was denied effective

4   assistance of appellate counsel.[12]  Finally, Petitioner contends that the cumulative effect of the errors

5   that occurred in <u>Hunter I</u> and <u>Hunter II</u> require that the Court grants his Petition.  The Court

6   considers each claim in turn.

7   **A.**      **<u>Violation of Constitutional Rights</u>**

8          At issue is whether Petitioner's constitutional rights were violated as a result of the trial

9   court's order allowing the prosecution in <u>Hunter II</u> access to and use of the Protected Files.

10          **1.**      **Constitutional Error**

11          The California Court of Appeal did not adjudicate the claim regarding constitutional error

12   "on the merits" for the purposes of § 2254(d).  <u>See</u> <u>Barker</u>, 423 F.3d at 1092; <u>Lambert</u>, 393 F.3d at

13   969.  Rather, it chose not to resolve the issue in light of its finding that Petitioner suffered no

14   prejudice from any potential errors.  (Appeal at 11.)  Thus, the Court reviews *de novo* whether the

15   trial court committed constitutional error.

16          Petitioner relies on <u>Bittaker v. Woodford</u>, which was decided after <u>Hunter II</u>, for the

17   proposition that the trial court's order permitting access to and the use of the Protected Files

18   constituted constitutional error.  331 F.3d 715 (9th Cir. 2003) (*en banc*).  In <u>Bittaker</u>, the Ninth

19   Circuit held that when a district court grants an evidentiary hearing to adjudicate an ineffective

20   assistance of counsel claim in a habeas proceeding, it may require the petitioner to waive his

21   attorney-client privilege only to the extent necessary to give the respondent an opportunity to

22   challenge the claim.  <u>Id.</u> at 720-21.  The scope of that waiver, however, must be limited to the habeas

---

[12]  Petitioner initially claimed ineffective assistance of appellate counsel out of concern that the Court might find a waiver by appellate counsel of his present substantive claims.  (Petitioner's Memorandum at 64.)  As both parties agree, the claim is moot because those claims are now properly before the Court. (Respondent's Memorandum at 44; Petitioner Michael Hunter's Memorandum of Points and Authorities in Support of his Traverse, in Further Support of his Petition for a Writ of Habeas Corpus, and in Reply to Respondents' Answering Memorandum at 68, hereafter, "Traverse Memorandum," Docket Item No. 65.)
       Accordingly, the Court DISMISSES this claim as moot.

28

United States District Court
For the Northern District of California

1  proceeding; the district court must prohibit the government from using the disclosed materials for

2  any purpose other than contesting the ineffective assistance claim, including their use in any retrial

3  of the petitioner.  Id. at 728; see also id. at 722 & n.6 (holding that the rule applies to both attorney-

4  client communications and attorney work product).

5          Petitioner's reliance on Bittaker, however, is unavailing for several reasons.  First, since it is

6  an unreviewed circuit court opinion, Bittaker is not clearly established federal law as determined by

7  the Supreme Court of the United States.  See Williams, 529 U.S. at 412; Barker, 423 F.3d at 1093.

8  Second, Bittaker references the present case and states specifically that the Court vacated the April

9  1996 Protective Order, which limited the waiver of the attorney-client privilege, in deference to

10  Anderson.  232 F.3d at 1053.  Anderson, which supplied the applicable rule at the time the April

11  1996 Protective Order was vacated, provides that a "protective order would effectively enjoin

12  California courts from adjudicating a state law issue concerning [a petitioner's] waiver of the

13  attorney-client privilege[.]"  Id. at 1100.  Thus, in 1996, it was for the state trial court, and not the

14  federal court considering the habeas petition, to decide whether or not the waiver should extend to

15  Petitioner's retrial.

16          Third, under the retroactivity analysis set out by the Supreme Court in Teague v. Lane,[13]

17  Bittaker cannot be applied retroactively.  Under Teague, "an old rule applies both on direct and

18  collateral review, but a new rule is generally applicable only to cases that are still on direct review."

19  Whorton v. Bockting, 549 U.S. 406, 416 (2007).  A new rule applies retroactively in a collateral

20  proceeding "only if (1) the rule is substantive or (2) the rule is a watershed rule of criminal

21  procedure implicating the fundamental fairness and accuracy of the criminal proceeding."  Id. (citing

22  Teague) (internal quotations omitted).  The Court finds that the rule in Bittaker is not a substantive

23  rule but rather a rule of criminal procedure.  Moreover, Bittaker is not a watershed rule, as it is not

24  "necessary to prevent an impermissibly large risk of an inaccurate conviction" and does not "alter

25

26  _____

27          [13]  489 U.S. 288 (1989).

28                                                    11

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

[the] understanding of the bedrock procedural elements essential to the fairness of a proceeding."[14] Whorton, 549 U.S. at 418 (internal quotations omitted).  Bittaker merely constrains the waiver of the attorney-client privilege to evidentiary habeas proceedings.  See Bittaker, 331 F.3d at 728.

Finally, even if Bittaker does apply retroactively, it does not necessarily follow that the prosecution's use of the Protected Files for impeachment and rebuttal purposes violated Petitioner's constitutional rights.  The Ninth Circuit, in deciding Bittaker, held that requiring habeas petitioners who bring ineffective assistance of counsel claims to waive the attorney-client privilege categorically and for all purposes would "violate the spirit, and perhaps the letter of Simmons v. United States."[15]  In Simmons, the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him on the issue of guilt."  390 U.S. at 394.  However, Simmons did not reach the issue of whether a habeas petitioner's potentially incriminating testimony submitted during a collateral proceeding could be used against him at trial for purposes other than to prove guilt.  Likewise, while Bittaker certainly narrowed the scope of a habeas petitioner's waiver of attorney-client privilege when bringing an ineffective assistance of counsel claim, the Ninth Circuit did not directly address whether the prosecution may use otherwise privileged materials obtained in a collateral proceeding for impeachment and rebuttal purposes.

Since Bittaker does not apply retroactively, the Court must rely on federal constitutional law as it stood at the time of the trial court's order.  At that time, the United States Supreme Court had clearly established the principle that the interests safeguarded by excluding evidence for impeachment purposes are "outweighed by the need to prevent perjury and to assure the integrity of

---

[14]  The watershed rule exception is "extremely narrow."  Whorton, 549 U.S. at 418 (quoting Schriro v. Summerlin, 542 U.S. 348, 352 (2004)).  It is unlikely that such rules have yet to emerge. Id.  In the years since Teague, the Supreme Court has rejected every claim that a new rule satisfied the requirements for watershed status.  Id.  Even the dramatic shift in Confrontation Clause law effected by Crawford v. Washington, 541 U.S. 36 (2004), was not held by the Court to have reached watershed status.  See also Whorton, 549 U.S. at 421; Ponce v. Felker, 606 F.3d 596, 604 (9th Cir. 2010).

[15]  390 U.S. 377 (1968).

the trial process." <u>Stone v. Powell</u>, 428 U.S. 465, 488 (1976).  The Court had also held that a criminal defendant's privilege to testify in his defense or refuse to do so "cannot be construed to include the right to commit perjury."  <u>Harris v. New York</u>, 401 U.S. 222, 225 (1971).  A defendant may not "provide himself with a shield against contradiction of his untruths."  <u>Walder v. United States</u>, 347 U.S. 62, 64 (1954).  Thus, under federal law as it stood at the time of the trial court's order, a defendant's right to prevent admission of privileged or otherwise protected materials was not absolute, and instead had to be weighed against the court's interest in ensuring the veracity of evidence presented to the jury.[16]

Here, there were two documents released during <u>Hunter Habeas I</u> that are at issue: (1) a report from Dr. Paul Berg ("Dr. Berg"), a psychologist, and (2) a letter from Dr. Orm Aniline ("Dr. Aniline"), a psychiatrist.[17]  Dr. Berg had interviewed and tested Petitioner in April 1982 at the request of Petitioner's counsel to advise the defense during <u>Hunter I</u>.[18]  Dr. Aniline, a defense

---

[16]    The California Supreme Court had also at that time addressed the issue of admissibility at trial of materials discovered in collateral proceedings:

> [S]uch testimony, is inadmissible against the [petitioner] during subsequent proceedings on the related criminal charges, save for purposes of impeachment or rebuttal where the [petitioner's testimony] or evidence . . . and his testimony on direct examination at the criminal proceeding are so clearly inconsistent as to warrant the trial court's admission of the [testimony] or its fruits in order to reveal to the trier of fact the probability that the [petitioner] has committed perjury at either the trial or the revocation hearing.

<u>People v. Coleman</u>, 13 Cal. 3d 867, 889 (Cal. 1975).  While a state court's holdings with respect to issues of federal constitutional law are not authoritative, the Court finds that the court's analysis in <u>Coleman</u> is consistent with the clearly established Supreme Court law as it stood then.  Thus, the Court finds that <u>Coleman</u> provides further support for the proposition that the <u>Hunter II</u> court did not err when it permitted the prosecution to use materials discovered in <u>Habeas I</u> for purposes of impeachment or rebuttal.

[17]    (Appeal at 11-13; Memorandum of Points and Authorities at 28, hereafter, "Respondents' Memorandum," Docket Item No. 23-1.)

[18]    (Appeal at 11; Petition ¶ 113; Petitioner's Memorandum at 34-35; Respondents' Memorandum at 29-30.)

13

psychologist had written a letter to Petitioner's <u>Hunter I</u> trial counsel revealing that Petitioner threatened to kill witness Jeff Luther, who arranged Petitioner's capture in San Diego.[19]

The prosecution called Dr. Berg as a witness during its rebuttal case in <u>Hunter II</u> to "challeng[e] [P]etitioner's diminished capacity defense."[20]  The prosecution was permitted to interrupt Petitioner's testimony and call Dr. Berg out of order in order to rebut Petitioner's statements and challenge Petitioner's credibility.[21]  Thus, the Court finds that the prosecution's access to Dr. Berg's report does not amount to a constitutional error as his report was used solely to impeach Petitioner's own testimony.  <u>See</u> <u>Stone</u>, 428 U.S. at 488; <u>Harris</u>, 401 U.S. at 225; <u>Walder</u>, 347 U.S. at 64; <u>Coleman</u>, 13 Cal. 3d at 889.

The prosecution referenced Dr. Aniline's letter in its cross-examination of defense expert Dr. Roderick Pettis.[22]  The prosecution did so pursuant to a stipulation made on the record that the letter was not offered for the truth of the matter but rather as "a piece of evidence to test [Dr. Pettis'] ultimate opinion."[23]  Thus, the Court finds that the prosecution's access to Dr. Aniline's letter does not amount to constitutional error, as the use of the letter was agreed upon by both parties.

**2.      Substantial and Injurious Effect**

Having found on *de novo* review that the state trial court did not commit constitutional error, the issue of whether any error had a substantial and injurious effect on Petitioner's retrial becomes moot.  However, assuming that the trial court had committed error, the Court considers whether that error would justify habeas relief.

---

[19]  (Appeal at 12-13; Petition ¶ 120;  Petitioner's Memorandum at 37; Respondents' Memorandum at 30.)

[20]  (Appeal at 11; Petition ¶ 113; Petitioner's Memorandum at 34-35.)

[21]  (Appeal at 12; Petition ¶ 113; Petitioner's Memorandum at 34-35.)  Petitioner testified on his own behalf in support of his diminished capacity defense in <u>Hunter II</u>, but did not do so in <u>Hunter I</u>.  (Respondents' Memorandum at 28.)

[22]  (Appeal at 12; Respondents' Memorandum at 30.)

[23]  (Appeal at 12 (internal quotations omitted).)

14

United States District Court

For the Northern District of California

1    Under Brecht v. Abrahamson,[24] where a state court applying the legal principles espoused in

2    Chapman v. California[25] finds a constitutional error harmless, a federal habeas court applies an

3    "objectively unreasonable" standard of review to the state court's harmless error analysis.  See

4    Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).

5         Here, the state appellate court applied Chapman and provided a thorough and detailed

6    analysis in concluding that any potential error produced no substantial and injurious effect in

7    Petitioner's case.  (See Appeal at 20.)  The state appellate court found that the prosecution used Dr.

8    Berg's report to impeach Petitioner's testimony, not to support its case-in-chief, and that Dr.

9    Aniline's statement was supported by the "considerable evidence of [Petitioner's] extensive

10   planning of the killings, much of it introduced through [Petitioner's] own testimony."  (Id. at 21.)

11   With respect to Dr. Aniline's statement, the state appellate court further found that "the evidence

12   that [Petitioner] made a threat, almost a year after the homicides, to kill the friend who had turned

13   him in was not prejudicial."  (Id. at 21.)  Thus, the Court finds that the state appellate court's

14   rejection of Petitioner's claim was not objectively unreasonable.

15        Petitioner also contends that access to the Protected Files gave "the prosecution . . . a

16   significant leg up in being able to effectively develop its own case strategy[.]"  (Petitioner's

17   Memorandum at 63.)  Thus, Petitioner contends he was additionally prejudiced.  The Court finds

18   Petitioner's contention unavailing.  In determining whether Petitioner was "substantially" prejudiced

19   under Chapman, the state appellate court noted that "[Petitioner] was represented by counsel, was

20   able to introduce extensive evidence to support his defense of diminished capacity, and was allowed

21   to testify.  He has made no claim that the jury or judge was [not] impartial.  We do not believe that

22   the trial court's order rendered the trial fundamentally unfair.  These circumstances do not [fall

23   under] Chapman[.]"  (Appeal at 14.)  The state appellate court held that "[e]ven if we assume, as

24   contended by [Petitioner] that the court erred . . . , and that the Chapman standard of prejudice

25

26        [24]  507 U.S. 619, 629 (1993).

27        [25]  386 U.S. 18, 21-22 (1967) (finding error harmless where error was "unimportant and
     insubstantial" to ultimate outcome of case).

28                                              15

applies, we conclude any such error was harmless beyond a reasonable doubt." (Id. at 13.)  In light of this analysis, the Court finds that the state appellate court considered any advantage the prosecution had as a result of access to the Protected Files and found that it did not rise to the level of prejudice that would warrant reversal under Chapman.  In addition, the Court finds that the state appellate court's rejection of Petitioner's claim on the basis of Chapman was not objectively unreasonable under Brecht.

Accordingly, the Court finds that Petitioner is not entitled to habeas corpus relief based on his claims under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**B.      Prosecutorial Misconduct**

At issue is whether the prosecution violated the Court's protective order and committed prosecutorial misconduct when it accessed the Protected Files.

The Court applies a *de novo* standard of review because the state appellate court declined to address the issue of prosecutorial misconduct.  (Appeal at 15.)  Claims of prosecutorial misconduct are cognizable in federal habeas proceedings.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Id.  Under Darden, the first issue to be decided is whether the prosecutor's actions were improper; if so, the next issue is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

Here, Petitioner represents that the Attorney General did not file the Protected Files under seal in Hunter Habeas I and that the District Attorney reviewed parts of the Protected Files without first seeking judicial approval pursuant to the April 1996 Protective Order.[26]  (Petitioner's Memorandum at 62.)  Neither the Attorney General nor the District Attorney deny Petitioner's

---

[26] Following a recommendation from Justice Kline of the California Court of Appeal, the California Bar Association conducted an investigation and determined that the allegation of professional misconduct against the Deputy Attorney General did not warrant further action. (Respondents' Memorandum at 37, Exs. W, X, Docket Item Nos. 45, 46.)  Thus, the Court finds that Petitioner's claim of misconduct as it pertains to the Attorney General is without merit.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

factual representations.  (Respondents' Memorandum at 37.)  The Court's April 1996 Protective Order explicitly states that documents produced by Petitioner in <u>Hunter Habeas I</u> "may not be disclosed in whole or in part or in any form to any other person or agencies without further order from this Court."[27]  (September 2001 Order at 2.)  Although Respondents contend that the District Attorney had a right to access portions of the Protected Files because they were filed publicly, the explicit language of the April 1996 Protective Order is unambiguous in its declaration that the documents "may not be disclosed."  (<u>Id.</u>)  Thus, the Court finds that the District Attorney acted improperly in disregarding the Court's protective order[28] and accessing the Protected Files.

However, because the Court has already determined that the trial court did not commit constitutional error in granting access to the Protected Files, the District Attorney's misconduct was not so egregious as to render the trial "fundamentally unfair."  <u>Darden</u>, 477 U.S. 168 at 181.  Although the District Attorney initially accessed the Protected Files without judicial approval, the trial court eventually granted access regardless.  (<u>See</u> Harris Decl., Ex. A, <u>Hunter II</u> Reporter's Transcript at 213.  )  Thus, the Court finds that the District Attorney's misconduct does not constitute a denial of due process.

Accordingly, the Court finds that Petitioner is not entitled to habeas corpus relief as to his claim of prosecutorial misconduct.

**C.**     **<u>Ineffective Assistance of Counsel</u>**

At issue is whether Petitioner's counsel's conduct denied Petitioner his constitutional right to effective assistance of counsel at his retrial.  Petitioner contends that his attorney's deficient conduct left him no choice but to raise a claim of ineffective assistance of counsel and concomitantly waive his attorney-client privilege, which ultimately allowed the prosecution to use the Protected Files at retrial.  (Petitioner's Memorandum at 63.)

_____

[27]  Although the Court vacated the April 1996 Protective Order on September 13, 2001, this Order does not justify the District Attorney's conduct because the District Attorney viewed the Protected Files prior to September 13, 2001.  (Appeal at 18.)

[28]  The deliberate decision of a prosecutor to defy a court's order constitutes "outrageous misconduct."  <u>People v. Pigage</u>, 112 Cal. App. 4th 1359, 1374 (Cal. Ct. App. 2003.)

United States District Court

For the Northern District of California

1     Here, the state appellate court found the prejudicial effect of the prosecution's use of the

2     Protected Files at Petitioner's retrial to be harmless.  (Appeal at 15.)  Therefore, in assessing the

3     state appellate court's harmless error analysis, the Court must "perform an 'independent review of

4     the record' to ascertain whether the state court decision was objectively unreasonable."  Pinholster v.

5     Ayers, 590 F.3d 651, 663 (9th Cir. 2009).

6     The benchmark for judging any claim of ineffective assistance of counsel must be whether

7     counsel's conduct so undermined the proper functioning of the adversarial process that the trial

8     cannot be relied upon as having produced a just result.[29]  To prevail on a Sixth Amendment

9     ineffective assistance of counsel claim, a petitioner must establish two elements.  First, he must

10    establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of

11    reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, he must establish that

12    he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability

13    that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

14    Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the

15    outcome.  Id.  A court need not determine whether counsel's performance was deficient before

16    examining the prejudice suffered by the petitioner resulting from alleged deficiencies.  See

17    Strickland, 466 U.S. at 697; Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995)

18    (upholding district court's refusal to consider whether counsel's conduct was deficient after

19    determining that petitioner could not establish prejudice).

20    Here, applying the Strickland standard, the Court first addresses the issue of whether trial

21    counsel's performance prejudiced Petitioner to the extent that it ultimately resulted in the release of

22    privileged materials.  An examination of the record reveals that the state appellate court fully

23    considered the prejudicial effect of the trial court's decision to allow the prosecution use of the

24

---

25    [29] Strickland v. Washington, 466 U.S. 668, 686 (1984).  Because the California Supreme
      Court declined to review Petitioner's appeal in December 2008, the Court applies the United States
26    Supreme Court's standard for analyzing ineffective assistance claims set forth in Strickland as the
      relevant "clearly established Federal law" at that time.  See Williams v. Taylor, 529 U.S. 362, 404-
27    08 (2000).

28

1   Protected Files.[30]  For the reasons previously discussed, the Court finds that the weight of evidence

2   supports the state appellate court's determination that any prejudicial effect was harmless.  Thus, the

3   state appellate court's decision was not objectively unreasonable.

4        Accordingly, the Court finds that Petitioner is not entitled to habeas corpus relief on the

5   ground that he was denied effective assistance of trial counsel.

6   **D.   Cumulative Error**

7        Petitioner contends in the alternative that the cumulative errors in his trial result in prejudice

8   sufficient to warrant overturning his conviction.  (Petitioner's Memorandum at 65.)

9        In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the

10  cumulative effect of several errors may still prejudice a defendant to such an extent that his

11  conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003);

12  Thomas v. Hubbard, 273 F.3d 1164, 1179-81 (9th Cir. 2002).[31]  Cumulative error is more likely to

13  be found prejudicial when the government's case is weak.  See, e.g., Thomas, 273 F.3d. at 1180.

14  However, where there is no single constitutional error, there are no errors which may accumulate to

15  a constitutional violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

16       In evaluating a due process challenge based on the cumulative effect of multiple trial errors,

17  a reviewing court must determine the relative harm caused by the errors.  See Parle v. Runnels, 505

18  F.3d 922, 928 (9th Cir. 2007).  If the evidence of guilt is otherwise overwhelming, the errors are

19  considered "harmless" and the conviction will generally be affirmed.  See United States v. Berry,

20  627 F.2d 193, 201 (9th Cir. 1980).

21       Here, the Court has found no single error that produced prejudice in Petitioner's case.

22  Additionally, there was "considerable evidence of [Petitioner's] extensive planning of the killings,

23

24       [30]  (Appeal at 13.)  Because the issue of prejudice was not developed by the parties, the state
     appellate court specifically requested additional briefing on the issue.  (Id. at 11.)

25       [31]  For example, in United States v. Frederick, the Ninth Circuit found prejudice resulting
26  from the cumulative effect of improper vouching by prosecutor, improper comment by prosecutor
     about defense counsel, and improper admission of evidence previously ruled inadmissible required
27  reversal even though each error evaluated alone might not have warranted reversal.  78 F.3d 1370,
     1381 (9th Cir. 1996).

28

United States District Court

For the Northern District of California

1    much of it introduced through [Petitioner's] own testimony[.]"  (Appeal at 13.)  In light of the

2    prosecution's already strong case and the Court's conclusion that Petitioner was not prejudiced by

3    any single error, the Court finds that the cumulative effect of any errors in Petitioner's case did not

4    prejudice Petitioner to such a degree that his conviction must be overturned.  See Alcala, 334 F.3d at

5    893-95.

6         Accordingly, the Court finds that Petitioner is not entitled to habeas corpus relief based on

7    his claim that the cumulation of errors in his case warrants overturning his conviction.

8         In sum, the Court DENIES Petitioner's Petition for Writ of Habeas Corpus as to all claims.

9    **E.**    **Certificate of Appealability**

10        At issue is whether the Court should issue a certificate of appealability.

11        The federal rules governing habeas cases brought by state prisoners require a district court

12   that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  See Rule

13   11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  To

14   obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a

15   constitutional right."  28 U.S.C. § 2253(c)(2).  Specifically, if a court denies a petition, a certificate

16   of appealability may only be issued "if jurists of reason could disagree with the district court's

17   resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

18   to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003); see

19   also Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the

20   merits of his case, he must demonstrate "something more than the absence of frivolity or the

21   existence of mere good faith on his . . . part."  Miller-El, 537 U.S. at 338.  The Ninth Circuit recently

22   described this standard as lenient.  See Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en

23   banc).

24        Here, the Court finds that there is little room for disagreement that the clearly established

25   Supreme Court law in place at the time of Hunter II did not prohibit the prosecution's access to and

26   use of otherwise privileged materials obtained in a collateral proceeding for impeachment and

27   rebuttal purposes at retrial.  Bittaker, which undoubtedly narrowed the scope of the waiver of

28                                              20

attorney-client privilege arising from an ineffective assistance of counsel claim, had not yet been decided, does not have retroactive effect, and remains an unreviewed circuit court decision whose precise contours have yet to be clearly defined.  Furthermore, given the extensive evidence of guilt presented at trial and the limited use of defense trial counsel's files for impeachment and rebuttal purposes, the Court finds little ground to take issue with the state appellate court's conclusion that if there was constitutional error, it did not produce a substantial and injurious effect on Petitioner's case.

Accordingly, the Court will not issue a certificate of appealability.

### V.  CONCLUSION

The Court DENIES the Petition for Writ of Habeas Corpus as to all claims.  A certificate of appealability will not be issued.  Judgment shall be entered accordingly.

Dated: December 20, 2010

_____
JAMES WARE
United States District Judge

21

1   **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2   Allen Robert Crown allen.crown@doj.ca.gov
    Daniel Bennett Harris dbh2007@sbcglobal.net

3

4   **Dated: December 20, 2010**                    **Richard W. Wieking, Clerk**

5

6                                                   **By:     /s/ JW Chambers**
                                                         **Elizabeth Garcia**
7                                                        **Courtroom Deputy**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California